UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLORY J. AMBRIZ,<br><br>                    Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL, Acting Commissioner of Social Security,<br><br>                    Defendant. | Case No.: 3:17-cv-1453-CAB-PCL<br><br>**REPORT AND RECOMMENDATION OF U.S. MAGISTRATE JUDGE RE:**<br><br>**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT** |

## **I. INTRODUCTION**

Before the Court now is Plaintiff GLORY J. AMBRIZ ("Plaintiff"), seeking judicial review of a decision by the Social Security Administration regarding Plaintiff's application for supplemental security income benefits ("SSI") pursuant to 42 U.S.C. § 405(g). (Doc. 1.) Plaintiff has filed a motion for summary judgment. (Doc. 14.) Defendant NANCY A. BERRYHILL ("Commissioner") filed an opposition to Plaintiff's motion concurrently with her own cross-motion for summary judgment. (Doc. 18.)

The Honorable Cynthia A. Bashant has referred the matter to the undersigned Judge for Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 72.1(c)(1)(d). Having carefully considered the motions, pleadings, and administrative record lodged in this case, the Court recommends Commissioner's motion

for summary judgment be **GRANTED** and Plaintiff's motion for summary judgment be **DENIED**.

## II. FACTUAL BACKGROUND

On December 10, 2012, Plaintiff applied for SSI. (Administrative Record (AR) at 192.) At that time, Plaintiff was 18 years old. (*Id.*) In this original application, Plaintiff claims she is qualified to receive SSI because she is disabled as a result of the following ailments: fibromyalgia, chronic fatigue syndrome, dysmenorrhea, xenotropic murine leukemia virus (XMRV), mitochondrial myopathy, a weakened immune system, and chronic infections. (*Id.* at 212.)

Plaintiff recalls her medical issues beginning when she was scratched by a cat in third grade, from which she contracted mononucleosis. (*Id.* at 41, 440.) After recovering from this illness, Plaintiff was hospitalized intermittently throughout the following year as a result of "elevated liver levels." (*Id.*) In sixth grade, Plaintiff contracted mononucleosis once again. (*Id.* at 42.) In that same year, Plaintiff was diagnosed with XMRV. (*Id.* at 291, 367, 440.) This retrovirus, similar to HIV, caused Plaintiff to have a severely weakened immune system. To accommodate her newly weakened immune system, Plaintiff left public school and began a homeschooling program. (*Id.* at 440.)

In the years that followed, Plaintiff has been tested for a myriad of autoimmune diseases and other conditions in order to diagnose and treat her various complaints. (*See*, *e.g.*, *id.*) These tests led medical professionals to believe Plaintiff suffers from both chronic fatigue syndrome as well as fibromyalgia. (*Id.* at 259, 312.) Plaintiff was also diagnosed with severe dysmenorrhea at the age of 12. (*Id.* at 312.) At some point, Plaintiff was diagnosed also with mitochondrial myopathy. (*Id.* at 322.) On May 25, 2013, after having received all of these diagnoses and been prescribed various medications to alleviate the worst symptoms, Plaintiff presented at a psychiatric consultative examination complaining of depression. (*Id.* at 315.) Plaintiff stated the combination of her medical conditions and the restraints the conditions impose upon her

//

life were the cause of her depression. (*Id*. at 316.) Prior to this examination, Plaintiff had been prescribed both Ambien and Zoloft to address her depression symptoms. (*Id*.)

As a result of Plaintiff's medical conditions, Plaintiff is essentially homebound. On most days, Plaintiff states she is in too much pain or too uncomfortable to do more than simple tasks around the house. These tasks include laundry, straightening up her bedroom, and working in the kitchen. On better days, Plaintiff can complete these tasks alone; but more often than not, Plaintiff requires assistance to do so. (*See*, *e.g.*, *id*. at 44.) Although Plaintiff can leave her home, she chooses not to do so very frequently. Plaintiff generally does not leave her home for two reasons. First, Plaintiff lives in constant apprehension of a "flare up," meaning when Plaintiff will be overcome with pain or discomfort such that she must immediately return home to rest. Plaintiff stated she does not have much warning of these flare ups before they occur. Secondly, Plaintiff has a significantly weakened immune system, which makes her especially susceptible to contracting any viruses which may be present in any environment Plaintiff enters. (*Id*. at 232.) When Plaintiff does leave her home, she is able to drive, but Plaintiff prefers to have another person with her in case she has a flare up while she is away from the home. (*Id*. at 42-43.) Plaintiff primarily goes grocery shopping and to the movie theatre with her boyfriend on her excursions away from home.

At one point in 2011, Plaintiff did obtain employment at an art store, where Plaintiff performed data entry in the back room of the store. (*Id*. at 39.) Plaintiff also would bring products from the storeroom to the front of the store for others. (*Id*.) However, after three eight-hour workdays, Plaintiff was not able to continue the employment. (*Id*.) Plaintiff stated she was "okay for about a day, and then after that [she] was so tired [she] couldn't wake up on time." (*Id*.) After these three days of working, Plaintiff took three and a half weeks to recover back to what she considers "normal." (*Id*.)

Currently, Plaintiff is not employed. Plaintiff resides with her boyfriend at his parents' residence in San Diego. Plaintiff obtained her GED, but she is unable to complete college courses – even those online prove too physically demanding. (*Id*. at 38-

39.) In order to ensure Plaintiff is able to go about her daily routine, Plaintiff is on a robust regimen of medications. These medications, as of May 8, 2015, included: four medications for both food and environmental allergies, sleeping medications, birth control to alleviate the dysmenorrhea, fibromyalgia medication, two medications for pain, nausea medication, medication to address familial Mediterranean virus, and depression medication. (*Id*. at 255.)

### III. ADMINISTRATIVE PROCEEDINGS

Plaintiff filed this application for SSI on December 10, 2012. (*Id*. at 192.) The application was initially rejected by the Social Security Administration on June 28, 2013. (*Id*. at 91-92.) The reason cited for this rejection was that Plaintiff's "condition result[s] in some limitations in [Plaintiff's] ability to perform work related activities but does not prevent [Plaintiff] from working." (*Id*. at 92.) Plaintiff requested her case be reconsidered by sending a letter on August 14, 2013. (*Id*. at 96.) In this letter, Plaintiff argued the denial of her application was incorrect because Plaintiff is "disabled and [in] poor health due to all of [her] medical conditions [which] affect[] every aspect of [Plaintiff's] daily life." (*Id*.)

On November 20, 2013, the Social Security Administration reviewed Plaintiff's case, and found the first decision was correctly made. (*Id*. at 97.) Again, the Administration found Plaintiff's "condition is not severe enough to keep [Plaintiff] from working." (*Id*.) Upon this denial, Plaintiff requested a *de novo* hearing for review by an Administrative Law Judge (ALJ) on January 17, 2014. (*Id*. at 102.) On May 12, 2015, Plaintiff received notice that her hearing was scheduled on July 20, 2015. (*Id*. at 139.) During this hearing, technical difficulties complicated the proceedings and the ALJ also determined the hearing was being held in an improper venue. (*Id*. at 61-63.) The hearing was terminated upon a motion being made to transfer Plaintiff's case to the proper venue. (*Id*.)

On January 6, 2016, Plaintiff received another hearing before a different ALJ who heard Plaintiff's testimony. (*Id*. at 35-53.) After this hearing, the ALJ rendered an

unfavorable decision, denying Plaintiff's application. (*Id*. at 14-26.) Specifically, the ALJ issued the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since November 28, 2012, the application date.
> 2. The claimant has the following severe impairments: fibromyalgia; history of chronic fatigue syndrome; and history of dysmenorrhea.
> 3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.
> 4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 416.967(b).
> 5. The claimant has no past relevant work.
> 6. The claimant was born on February 10, 1994 and was 18 years old, which is defined as a younger individual age 19-49, on the date the application was filed.
> 7. The claimant has at least a high school education and is able to communicate in English.
> 8. Transferability of job skills is not an issue because the claimant does not have past relevant work.
> 9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.
> 10. The claimant has not been under a disability, as defined in the social Security Act, since November 28, 2012, the date the application was filed.

(*Id*. at 19-26.)

Upon receipt of this unfavorable decision, Plaintiff appealed to the Appeals Council on March 25, 2016. (*Id*. at 189.) On May 16, 2017, the Appeals Council considered Plaintiff's appeal, as well as new evidence submitted, but ultimately found there was no basis for changing the ALJ's denial of Plaintiff's application for SSI. (*Id*. at 1-6.) Plaintiff then filed the instant case in this Court on July 18, 2017. (Doc. 1.) Commissioner filed an answer and lodged the administrative record on October 30, 2017. (Docs. 11, 12.) Following this, each party submitted its own motion for summary judgment: Plaintiff filed hers on December 7, 2017, and Commissioner filed hers on January 2, 2018. (Docs. 14, 18.) These cross motions are now before the Court.

# IV. STANDARD OF REVIEW

The decision that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence in the record and the proper legal standards were applied. *Schneider v. Comm'r of the Soc. Sec. Admin.*, 223 F.3d 968, 973 (9th Cir. 2000); *Morgan v. Comm'r of the Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999); *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999).

The findings of the ALJ as to any fact, if supported by substantial evidence, are conclusive. *See Miller v. Heckler*, 770 F.2d 845, 847 (9th Cir. 1985). Substantial evidence is more than a mere scintilla, but less than a preponderance. *Saelee v. Chater*, 94 F.3d 520, 521 (9th Cir. 1996). "'It means such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

An ALJ engages in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Id*. at 1036 (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

The claimant is not required to show objective medical evidence of the pain itself or of a causal relationship between the impairment and the symptom. *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996). Instead, the claimant must only show that an objectively verifiable impairment "could reasonably be expected" to produce his pain." *Lingenfelter*, 504 F.3d at 1036 (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v.*

*Comm'r of Soc. Sec.*, 533 F.3d at 1160-61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be expected to produce' pain or another symptom . . . requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon").

Second, if a claimant shows that she suffers from an underlying medical impairment that could reasonably be expected to produce her pain or other symptoms, the ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how the symptoms, including pain, limit the claimant's ability to work. *See* 20 C.F.R. § 404.1529(c)(1). In making this evaluation, the ALJ may consider the objective medical evidence, the claimant's daily activities, the location, duration, frequency, and intensity of the claimant's pain or other symptoms, precipitating and aggravating factors, medication taken, and treatments for relief of pain or other symptoms. *See* 20 C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

At this second evaluative step, the ALJ may reject a claimant's testimony regarding the severity of her symptoms only if the ALJ "makes a finding of malingering based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and convincing reasons" for finding the claimant not credible. *Carmickle*, 533 F.3d at 1160 (quoting *Lingenfelter*, 504 F.3d at 1036).

## IV. DISCUSSION

The ALJ found Plaintiff has the following severe impairments: fibromyalgia, history of chronic fatigue syndrome, and history of dysmenorrhea. (*Id.*) The ALJ further concluded Plaintiff had additional impairments which are non-severe. These conditions include: recurrent sinus infections, asthma, obesity, depression disorder, and anxiety disorder. (*Id.* at 19-20.) The ALJ deemed these conditions non-severe because they "do not *more than minimally* affect" Plaintiff's ability to perform basic work activities. (*Id.*, emphasis in original.) The ALJ did not categorize Plaintiff's XMRV as either severe or

//

non-severe. The ALJ also determined Plaintiff's impairments did not meet or medically equal the severity of one of the listed impairments in the regulations. (*Id*. at 21.)

Finally, the ALJ made a finding that Plaintiff "has the residual functional capacity to perform the full range of light work" as set out in the regulations. (*Id*.) In making this finding, the ALJ "considered all symptoms and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence, . . . ." (*Id*.) Specifically, the ALJ noted Plaintiff presented "very little objective evidence" to support her testimony of being in almost constant pain. (*Id*. at 23.) Instead of showing any signs of the extreme pain Plaintiff complained of, Plaintiff's numerous comprehensive physical examinations produced results which the ALJ considered "otherwise unremarkable" in that they showed no symptoms other than tenderness in areas complained of. (*Id*.) Based on this, the ALJ found Plaintiff was not disabled and therefore denied her application. (*Id*. at 25.)

Plaintiff argues summary judgment is appropriate because the ALJ's denial of Plaintiff's application, finding Plaintiff was not in fact disabled, lacked "the support of substantial evidence" and ultimately rested "upon error of law." (Doc. 14-1 at 10.) Specifically, Plaintiff argues the ALJ erred in not believing Plaintiff's testimony concerning her pain and fatigue. (*Id*. at 10-11.) Instead, the ALJ found there was no objective evidence supporting Plaintiff's claims of pain and fatigue, which, according to Plaintiff, meant the ALJ incorrectly ignored the medical diagnostic testing. (*Id*.) Initially, Plaintiff sought judicial review of the ALJ's decision based on the following grounds: (1) there being no substantial medical or vocational evidence to support the ALJ's conclusion Plaintiff is not disabled; (2) no substantial evidence supports the finding that Plaintiff can perform any substantial gainful activity; (3) the evidence only shows Plaintiff has been, and continues to be, disabled under the Social Security Act; and (4) new evidence warrants a remand for further proceedings. (Doc. 1 at 2-3.)

Contrarily, Commissioner seeks summary judgment on the grounds that the ALJ properly evaluated Plaintiff's complaints in light of her subjective testimony and the

XMRV diagnosis. (Doc. 17 at 13-14.) Commissioner argues that in considering all the factors of Plaintiff's complaints, the ALJ properly weighed the evidence and properly determined Plaintiff's residual functional capacity. (*Id.*) According to Commissioner, Plaintiff is mistaken because the ALJ's conclusion was not reached based on faulty premises. (*Id.*)

### A. Classification of Plaintiff as not disabled

The ALJ found, after considering Plaintiff's alleged disabling conditions, the related testimony, and all the medical evidence, that Plaintiff has a residual functional capacity to perform the full range of light work. (AR at 25.) Given this finding, the ALJ found Plaintiff is not in fact disabled, though she is afflicted by severe medical conditions. Plaintiff disputes this and claims "the evidence in the record supports only the finding that [P]laintiff is disabled." (Doc. 1 at 3.) The Court will consider each condition deemed severe by the ALJ in turn.

#### *1. Fibromyalgia*

Ninth Circuit cases have determined that fibromyalgia can be disabling. In *Benecke v. Barnhart*, 379 F.3d 587, 589-90 (9th Cir. 2004), the Ninth Circuit described fibromyalgia as follows:

> Fibromyalgia, previously called fibrositis, [is] a rheumatic disease that causes inflammation of the fibrous connective tissue components of muscles, tendons, ligaments, and other tissue. *See*, *e.g.*, *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech, Inc.*, 125 F.3d 794, 796 (9th Cir. 1997); *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n. 1 (8th Cir. 2003). Common symptoms, . . . , include chronic pain throughout the body, multiple tender points, fatigue, stiffness, and a pattern of sleep disturbance that can exacerbate the cycle of pain and fatigue associated with this disease. *See Brosnahan*, 336 F.3d at 672 n. 1; *Cline v. Sullivan*, 939 F.2d 560, 563 (8th Cir. 1991). Fibromyalgia's cause is unknown, there is no cure, and it is poorly understood within much of the medical community. The disease is diagnosed entirely on the basis of patients' reports of pain and other symptoms. The American College of Rheumatology issued a set of agreed-upon diagnostic criteria in 1990, but to date there are no laboratory tests to confirm the diagnosis. *See Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 872 (9th Cir. 2004); *Brosnahan*, 336 F.3d at 672 n. 1.

*Id.*; *see also Harman v. Apfel*, 211 F.3d 1172 (9th Cir. 2000) (reversing ALJ decision denying benefits for fibromyalgia); *Bunnell*, 947 F.2d 341 (upholding benefits for fibrositis, now known as fibromyalgia). *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 877 (9th Cir. 2003), a case in which benefits were denied for fibromyalgia, recognized that the accepted diagnostic test is that Plaintiff must have pain in 11 of 18 tender points. *See also Rollins v. Massanari*, 261 F.3d 853, 855 (9th Cir. 2001) (11 of 18 tender points).

### a. Plaintiff's medical history

Dr. Amal Mehta treated Plaintiff from June 18, 2013 to September 29, 2014. (AR 542-554.) At Plaintiff's initial consultation with Dr. Mehta, Plaintiff reported she had been previously diagnosed with fibromyalgia. (*Id.* at 554.) During the time Dr. Mehta treated Plaintiff, Plaintiff's medical records continued to reflect this diagnosis of fibromyalgia; however, nowhere in the records is it indicated that Dr. Mehta undertook to perform the tender point test on Plaintiff to confirm the diagnosis. (*See id.* at 542-554.)

Also during this time, Plaintiff was being treated by Physician Assistants Shana Forsman and Chondra Shanks at Neighborhood Healthcare in Temecula, California. On January 20, 2014, P.A. Forsman first noted Plaintiff's fibromyalgia in the assessment section of the medical record, indicating the condition was a current rather than a "past diagnosis." (*Id.* at 505.) Also during this appointment, P.A. Forsman prescribed Norco tablets to Plaintiff to alleviate the pain associated with the fibromyalgia. (*Id.*) Finally, P.A. Forsman requested a second opinion from a rheumatologist regarding this diagnosis. In the same medical office, P.A. Shanks also examined Plaintiff on September 30, 2014. (*Id.* at 477.) During this appointment, eight months after the appointment with P.A. Forsman, P.A. Shanks included in her notes a reminder to obtain the recommendations from the rheumatologist. (*Id.*) These medical records do not indicate either P.A. Forsman or P.A. Shanks performed the diagnostic tender points test on Plaintiff at any point; instead, the diagnosis simply appears in the records, likely as a result of Plaintiff reporting the diagnosis, beginning on January 20, 2014.

About one year later, Plaintiff finally underwent a diagnostic test during a consultation with Dr. David J. Smith. Plaintiff, during an examination on February 23, 2015, had pain in 12 out of the 18 "trigger points." (*Id.* at 445.) Despite this pain, during a later consultation with Nurse Practitioner Timothy Lazarek on March 9, 2015, less than one month after the positive test, N.P. Lazarek noted Plaintiff "has no difficulty performing daily activities." (*Id.* at 571.) Instead, Plaintiff's pain on a one to ten scale is a five; she has morning stiffness in her neck and back which lasts for about 30 minutes after waking up; and her fatigue is moderate. (*Id.*)

### b. ALJ's opinion

In his opinion, the ALJ noted the numerous medical professionals' observations that Plaintiff's overall ability to function and complete day to day tasks was not impaired by her fibromyalgia. (*Id.* at 24.) In fact, Plaintiff "indicated that she could open jars; write legibly; turn door knobs; reach overhead; reach her back pocket; put on socks; climb stairs; and walk long distances." (*Id.*) The ability to complete these tasks clearly distinguishes Plaintiff's case from those where fibromyalgia makes daily activities practically impossible. *See, e.g., Benecke*, 370 F.3d 587, 590-593 (describing the plaintiff's medical history which included consulting with numerous doctors, missing work due to symptoms, seeking treatment through medications, physical therapy, massage treatments, and a support group, and so on, and not being able to perform menial tasks regularly).

In this case, Plaintiff initially was deemed able to function by N.P. Lazarek. (*Id.* at 571.) This was also the conclusion of Dr. Smith on May 22, 2015, (*Id.* at 654, "[Plaintiff] feels that the current treatment plan [Norco tablets] is effective for her and that although she [is] not pain free[,] she is able to function independently"), June 19, 2015, (*Id.* at 650 (same)), July 22, 2015, (Id. at 646 (same)), August 24, 2015, (*Id.* at 642 (same)), September 23, 2015, (Id. at 637 (same)), and October 23, 2015, (*Id.* at 632 (same)). Thus, while Plaintiff was in fact diagnosed with fibromyalgia, there is significant evidence in the record that her diagnosis does not prevent her from performing regular daily

activities. It follows then, that while fibromyalgia may be considered a severe impairment, the condition does not automatically render a person disabled. *See Benecke*, 370 F.3d 587, 589-90. Such is the situation in Plaintiff's case.

### 2. Chronic Fatigue Syndrome

Cases in the Ninth Circuit have found chronic fatigue syndrome ("CFS") to be disabling. *Reddick v. Chater*, 157 F.3d 715, 724, 729 (9th Cir. 1998) (CFS); *Wilson v. Comm'r*, 303 Fed. Appx. 565, 567 (9th Cir. 2008) (fibromyalgia and CFS); *Smolen*, 80 F.3d at 1284 (chronic fatigue and pain). Chronic fatigue or CFS is defined as "self-reported persistent or relapsing fatigue lasting six or more consecutive months." *Reddick*, 157 F.3d at 726.

In *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011), the Ninth Circuit addressed a similar situation and explained CFS and its diagnostic procedure as follows:

> [T]he final denial emphasized Salomaa's normal objective findings, and that there was "no underlying condition, such as cancer or HIV disease" to explain his fatigue or weight loss. These reasons were illogical, because such objective measures as blood tests are used to rule out alternative diseases, not to establish the existence of chronic fatigue syndrome. There is no blood test or other objective laboratory test for chronic fatigue syndrome. As we said in *Friedrich v. Intel Corp.*[, 181 F.3d 1105 (9th Cir. 1999)], the condition "does not have a generally accepted 'dipstick' test" and "[t]he standard diagnosis technique for [chronic fatigue syndrome] includes testing, comparing symptoms to a detailed Centers for Disease Control list of symptoms, excluding other possible disorders, and reviewing thoroughly the patient's medical history."
>
> As we said in dicta in a fibromyalgia case, "if the administrator had said, 'we will not accept fibromyalgia as a diagnosis unless you present objective evidence of it such as positive findings on x-rays,' she would have been demanding what cannot exist. . . ." We now establish as holding what was then dicta, that conditioning an award on the existence of evidence that cannot exist is arbitrary and capricious.

*Id.* at 677 (emphasis added) (citations omitted).

//

Here, the ALJ found that although Plaintiff had seen numerous different doctors for the "same complaints of fatigue and pain all over," the multiplicity of tests run on Plaintiff, including x-rays, MRIs, and CT scans "have consistently been within normal limits." (AR at 23.) The ALJ focused on the lack of objective medical evidence showing Plaintiff was in fact severely affected by CFS. (*Id.*) However, the ALJ was mistaken in searching for such objective evidence because no such evidence exists in any case. *Salomaa*, 637 F.3d at 968-69 (recognizing the Center for Disease Control's definition of chronic fatigue system, which notes in part that there are no "diagnostic tests for this condition [that] have been validated in scientific studies."). Thus, the Court is not concerned whether the ALJ was correct in finding Plaintiff's CFS was severe, because the ALJ was not proper in focusing his analysis of Plaintiff's disability status on the lack of objective medical evidence. A lack of objective evidence, as presented here, is not an absolute indicator of a person's ability or disability. (*Id.*).

### *3. Dysmenorrhea*

Dysmenorrhea is the medical term for pain experienced during menstruation. *Wright v. Colvin*, 2016 U.S. Dist. LEXIS 87561 at *4 n.2 (D. Or. July 6, 2016). In a May 16, 2013, report following an examination done for the purposes of this application, Dr. Bryan To found Plaintiff had a history of severe dysmenorrhea, which had been diagnosed when Plaintiff was 12 years old. (AR at 312.) In order to treat this, Dr. To noted Plaintiff has been prescribed multiple different birth controls as well as pain killers. (*Id.*) However, no course of action has been able to alleviate Plaintiff's symptoms.

The ALJ found this diagnosis of dysmenorrhea to be a severe impairment. (*Id.* at 19.) However, the ALJ further found that while severe, Plaintiff's dysmenorrhea does not prove a disabling impairment. (*Id.* at 25.) In reaching this conclusion, the ALJ notes that while Plaintiff has been working regularly with a gynecologist in order to alleviate this pain, Plaintiff's gynecological exam on March 3, 2015 had been "unremarkable." (*Id.* at 24, citing *id.* at 586-588.) Especially significant is that during this new patient

//

examination, nowhere in the record did Plaintiff's new gynecologist record Plaintiff's diagnosis of dysmenorrhea.

*4. Discussion*

The ALJ appears to have misunderstood the nature of plaintiff's severe impairments. CFS and fibromyalgia would not be expected to reduce muscle strength or produce abnormal neurological findings; indeed, the diseases are not diagnosed on the basis of objective criteria. *See Benecke*, 379 F.3d at 594 (holding that ALJ erred in effectively requiring 'objective' evidence for a disease that eludes such measurement); *Cook v. Liberty Life Assur. Co. of Boston*, 320 F.3d 11, 21 (1st Cir. 2003) (requiring objective documentation of chronic fatigue syndrome is unreasonable); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3rd Cir.1997) (same). As Plaintiff's chief complaints, CFS and fibromyalgia, as well as dysmenorrhea, understandably cannot be supported by objective medical findings, the ALJ's determination of Plaintiff's credibility is crucial to determining whether Plaintiff is entitled to benefits.

An ALJ determines whether a disability applicant is credible, and the court defers to the ALJ's discretion if the ALJ used the proper process and provided proper reasons. *See*, *e.g.*, *Saelee*, 94 F.3d at 522. If credibility is critical, the ALJ must make an explicit credibility finding. *Albalos v. Sullivan*, 907 F.2d 871, 873-74 (9th Cir. 1990); *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be supported by "a specific, cogent reason for the disbelief"). In evaluating whether subjective complaints are credible, the ALJ may consider: (1) the applicant's reputation for truthfulness, prior inconsistent statements or other inconsistent testimony, (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and (3) the applicant's daily activities. *Smolen*, 80 F.3d at 1284. A failure to seek treatment for an allegedly debilitating medical problem may be a valid consideration by the ALJ in determining whether the alleged associated pain is not a significant nonexertional impairment. *See Flaten v. Secretary of HHS*, 44 F.3d 1453, 1464 (9th Cir. 1995).

Here, the ALJ provided reasons for his determination that plaintiff was not credible. (*See* AR at 23, ". . . the [Plaintiff]'s statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.") First, in recent consultations with various doctors, Plaintiff "reported no difficulty performing daily activities." (*Id.*) In fact, Plaintiff noted she was able to "open jars, write legibly, turn door knobs, reach overhead, reach her back pocket, put on socks, climb stairs, and walk long distances." (*Id.*) Similarly, in a recent gynecologist appointment, Plaintiff failed to mention her dysmenorrhea altogether. (*See* AR 584-588.) Second, the ALJ noted that while examinations had shown tenderness on specific trigger points, further examination of Plaintiff's spine showed Plaintiff had a full range of motion, she had full muscle strength, and she had no tenderness or swelling of any joints. (*Id.*) Plaintiff also showed no signs of connective tissue disease or inflammatory arthropathy. (*Id.*) Lastly, the ALJ determined Plaintiff's testimony was not consistent with the medical evidence. (*Id.*)

While the ALJ's second and third reasons are questionable in light of Plaintiff's conditions eluding objective testing, the ALJ's first reason, Plaintiff's conflicting statements, is significant and sufficient to find Plaintiff is not credible. Here, the ALJ took into account Plaintiff's prior statements to medical professionals that Plaintiff had little trouble performing day to day tasks. As noted in *Smolen*, an applicant's daily activities and inconsistent testimony are available for use in determining Plaintiff's credibility. 80 F.3d at 1284. According to Plaintiff's own statements, Plaintiff is able to go about regular tasks during the day. (*See also* AR 632-54, where during numerous appointments, Plaintiff stated she was not completely pain free, but felt the treatment plan was working and she could function independently.) Additionally, given Plaintiff had told doctors she was able to do so, Plaintiff's later testimony before the ALJ is inconsistent. During her testimony, Plaintiff described pain as follows:

> It's the pain that it's – it's just everywhere. It's in my back. It's in my hands. Sometimes I can't hold pencils. It's just everywhere, my knees, my feet, all of my joints, and then the fatigue I don't have. I – I feel as though I don't have as much energy as everybody else. I feel like I get worn out so much

15

faster just doing anything normal that somebody else would be able to do. And like doing dishes I – I can't stand there that long. It hurts my back. I have to stop and go sit down, or lay down, and finish it later. I can't sit there and do the whole task at the same time.

(*Id.* at 43-33.)

As part of the overall disability analysis, the ALJ must consider whether there are any inconsistencies in the evidence, such as Plaintiff's inconsistent statements. *See* 20 C.F.R. § 404.1529(c)(4) (stating that an ALJ must consider "whether there are any inconsistencies in the evidence."); Social Security Ruling 96-7p, 1996 SSR LEXIS 4, 1996 WL 374186, at *5 (stating that a strong indicator of the credibility an individual's statements is their consistency, both internally and with other information in the record); *Webb v. Barnhart*, 433 F.3d 683, 688 (9th Cir. 2005) ("Credibility determinations do bear on evaluations of medical evidence when an ALJ is presented with conflicting medical opinions or an inconsistency between a claimant's subjective complaints and his diagnosed condition."). Thus, the ALJ properly considered Plaintiff's inconsistent statements and inconsistencies between her statements and the medical record when assessing her credibility. The ALJ provided clear and convincing reasons for finding Plaintiff's testimony to be not credible. (AR at 23.) Thus, the ALJ's ruling that Plaintiff was not disabled was appropriate because the ALJ properly considered Plaintiff's testimony in light of the nature of her conditions and the ALJ provided clear and convincing reasons for finding Plaintiff to not be credible.

### B. XMRV Diagnosis

Plaintiff also argues the ALJ improperly ignored her diagnoses of XMRV.[1] (Doc. 14-1 at 8-10.) Specifically, Plaintiff contends because the "ALJ did not state clear and

---

[1] Plaintiff does not explicitly make this argument, but Plaintiff's entire motion for summary judgment (Doc. 14-4), focuses primarily on Plaintiff's XMRV. So much so, in fact, that Plaintiff's motion hardly mentions Plaintiff's other conditions. The Court therefore addresses XMRV on its own in this section to determine whether the ALJ erred in not addressing XMRV such that the ALJ would have found Plaintiff disabled had he considered the XMRV.

16

convincing reasons for rejecting the complaints of pain and limitation" as well as rejecting the "inference that [Plaintiff] lacked the capacity for sustained exertion at any level in light of the diagnostic XMRV finding," the ALJ's determining Plaintiff is not disabled was erroneous. (Doc. 14-1 at 10.) Given this ultimate determination, Plaintiff seems to believe that had the ALJ considered her XMRV diagnosis, the ALJ's decision would have been different.

Commissioner denies this argument made by Plaintiff and instead claims the ALJ was justified in his decision because multiple examining medical professionals had not necessarily taken notice or emphasized this diagnosis. (*See* Doc. 17 at 14-15.) Additionally, there is nothing in the record to support the claim that XMRV limits Plaintiff from performing substantial gainful activity. In fact, in making this claim, Plaintiff cited a medical journal article which Commissioner argues stands for the opposite of Plaintiff's claim. (*Id*.) Given the simple lack of evidence presented regarding Plaintiff's XMRV diagnosis, Commissioner argues "there is nothing in the evidence suggesting that the ALJ should have considered XMRV any more than Plaintiff's own physicians did." (*Id*. at 15.)

Plaintiff was first tested for XMRV on August 24, 2010. (*Id*. at 291.) She received a positive result on September 19, 2010. (Id.) On May 16, 2013, Dr. To issued a report to the Comissioner regarding Plaintiff, wherein Dr. To discussed each of Plaintiff's ailments. (Id. at 308-314.) Nowhere in this report is Plaintiff's XMRV mentioned.

In his ruling, the ALJ briefly mentions Plaintiff's diagnosis with XMRV. (*Id.* at 22.) This mention pertains only to Plaintiff's testimony that Plaintiff had been diagnosed with XMRV "which was likely weakening [Plaintiff's] immune system." (*Id*.) However, the ALJ continued to state "not much is currently known about treatment for this." (*Id*.) Other than these two brief sentences, the ALJ does not address Plaintiff's XMRV any further.

Plaintiff, in her motion for summary judgment, focuses primarily on the XMRV diagnosis and its role in rendering Plaintiff disabled. (*See* Doc. 14-1 at 17-12.) In the

17

motion, Plaintiff states XMRV's symptoms and effects, including unexplained fatigue, impaired memory or cognition, pain, and immune, neurological, and autonomic symptoms. (*Id*. at 9, citing Simona Panelli et al., *XMRV and Public Health: The Retroviral Genome Is Not a Suitable Template for Diagnostic PCR, and its Association with Myalgic Encephalomyelitis/Chronic Fatigue Syndrome Appears Unreliable*, FRONTIERS IN PUBLIC HEALTH, May 22, 2017, at 1.) What Plaintiff fails to state, however, is where in the record these symptoms have both presented themselves and been attributed to the XMRV. Instead, Plaintiff makes a blanket claim that the ALJ was mistaken in finding there was no objective evidence pertaining to the XMRV diagnosis because the record included the actual diagnosis of XMRV. (*Id*. at 9.) While Plaintiff is correct in that the record does include her actual diagnosis of XMRV, Plaintiff fails to point to a place in the record where a medical report states how exactly this diagnosis affects Plaintiff. Although Plaintiff herself claims the XMRV causes her to have a weakened immune system, there is no medical professional noting this effect, or any other effects of the XMRV has on Plaintiff.

As the ALJ states, "not much is currently known about treatment for [XMRV]." (*Id*. at 22.) Both Plaintiff and Commissioner have cited only to medical publications instead of any portion of the record, clearly indicating a lack of information in both case law and the record. (*See* Doc. 14-1 at 9, Doc. 17 at 11 n.3, 12 n. 4. *See also* AR at 448 where Dr. Abel Toledo states "Will have to do some research on XMRV [because] there is a lot of controversy surrounding this subject and its connection with chronic fatigue syndrome, prostate ca[ncer], [and] other forms of ca[ncer].") At this point in the analysis, Plaintiff still bears the burden of showing XMRV is a severe impairment. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222. Despite Plaintiff showing she was in fact diagnosed with the disease, Plaintiff has not presented evidence in the record showing whether any of Plaintiff's symptoms were caused or exacerbated by Plaintiff's XMRV or how Plaintiff was otherwise affected by the disease. In light of this shortcoming, the ALJ cannot have erred in finding the XMRV was not a severe impairment.

**C. New evidence**

The Plaintiff argues new evidence submitted should warrant a remand of this matter for further proceedings. (Doc. 1 at 3.) This Court was not supplied with any evidence outside of that included in the AR, lodged by Commissioner. However, within the AR, there is a medical record that was submitted after the ALJ had ruled on Plaintiff's case. This record was from Asthma & Allergy Medical Group, and shows an initial consult on October 17, 2013, and an allergy test result from an appointment on December 2, 2013. (AR 31-34.) While the ALJ did not take this evidence into account as it was not provided by Plaintiff until after the hearing, the Appeals Council did. The Appeals Council found "this evidence does not show a reasonable probability that it would change the outcome of the decision." (AR at 2.) Therefore, the Appeals Council disregarded the evidence.

During Plaintiff's initial consultation with the Asthma & Allergy Medical Group, Plaintiff complained of multiple allergens. Particularly, Plaintiff complained she had adverse reactions to walnuts, pecans, and avocados – all of which she claimed caused anaphalyaxis. (AR at 33.) However, during her second appointment, her allergy skin testing was negative for all foods tested. (Id. at 31.) Similarly, Plaintiff initially complained of a previous skin test showing she was sensitive to animals with fur; however, Plaintiff currently resides in a home with one dog and two cats. (Id. at 33, 31.)

In submitting these medical records, Plaintiff failed to also submit any explanation as to why these alleged allergies should be considered a severe condition which would render Plaintiff disabled. Instead, Plaintiff merely stated in her complaint that "new and material evidence . . . warrants a remand of this matter for further proceedings." (Doc. 1 at 3.) Without any further explanation, the Court cannot agree with Plaintiff. Thus, the new evidence is immaterial and does not require the Court to remand.

//
//
//

# V. CONCLUSION

For the reasons set forth above, the Court recommends **GRANTING** Commissioner's motion for summary judgment and **DENYING** Plaintiff's motion for summary judgment.

This report and recommendation is submitted to the Honorable Cynthia A. Bashant pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before **June 1, 2018**. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be served and filed on or before **June 8, 2018**. The parties are advised that failure to file objections within the specific time may waive the right to appeal the district court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

Dated: May 11, 2018

_____
Hon. Peter C. Lewis
United States Magistrate Judge